DAVID W. SCOFIELD – 4140
**PETERS | SCOFIELD**
*A Professional Corporation*
7430 Creek Road, Suite 303
Sandy, Utah 84093-6160
Telephone:  (801) 322-2002
Facsimile:  (801) 912-0320
E-Mail:    dws@psplawyers.com

*Counsel for Plaintiffs and Putative Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| SHERRY TERESA, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> MAYO FOUNDATION FOR MEDICAL EDUCATION AND RESEARCH, <br><br> Defendant. | **FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** <br><br> Case No. 4:24-cv-00033-AMA-PK <br><br> Judge Ann Marie McIff Allen <br><br> Magistrate Judge Paul Kohler |

Plaintiff Sherry Teresa, individually and on behalf of all others similarly situated, makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge.

### <u>INTRODUCTION</u>

1.      Defendant Mayo Foundation for Medical Education and Research

("Mayo") rented, sold, and/or otherwise disclosed for compensation detailed information about Plaintiff's purchase of a subscription to Defendant's *Mayo Clinic Health Letter* magazine to data aggregators, data appenders, data cooperatives, list brokers, political organizations, aggressive direct-mail advertisers, and non-profit organizations.  As a result, Plaintiff has received a barrage of unwanted junk mail. By renting, selling, and/or otherwise disclosing for compensation Plaintiff's Private Purchase Information (defined below), without providing Plaintiff prior notice of these disclosures, Mayo violated Utah's Notice of Intent to Sell Nonpublic Personal Information Act, Utah Code Ann. § 13-37 (the "NISNPIA").

2.      Documented evidence confirms these facts.  For example, Mayo, through list broker NextMark, Inc. ("NextMark"), offers to provide renters access to the mailing list titled "MAYO CLINIC HEALTH LETTER Mailing List", which contains the Private Purchase Information of all 386,510 of Defendant's recent U.S. purchasers at a base price of "$110.00/M [per thousand]," (i.e., 11 cents apiece), as shown in the screenshot below:

# MAYO CLINIC HEALTH LETTER Mailing List

Mayo Foundation for Medical Education and Research. Mayo Clinic newsletters are backed by a century of patient care medical research and experience at one of the world's foremost medical centers. This eight page monthly newsletter provided reliable, accurate and practical information on today's health and medical news: Fitness & exercise, medical treatment breakthroughs, nutrition & healthy eating, tips on treating and preventing hundreds of illnesses. http://www.mayoclinic.com

**Get Count**   **Get Pricing**   **Get More Information**

| SEGMENTS | COUNTS THROUGH 02/20/2024 |
|---|---|
| 386,510 TOTAL UNIVERSE / BASE RATE | $110.00/M |
| 27,326 MONTHLY HOTLINE | + $15.00/M |
| 89,567 QUARTERLY HOTLINE | + $10.00/M |
| 164,121 6 MONTH HOTLINE | + $8.00/M |
| 386,510 ACTIVE US SUBS | $110.00/M |
| 24,338 12 MONTH COA | + $10.00/M |
| 338,193 12 MONTH EXPIRES | $80.00/M |

| | |
|---|---|
| POPULARITY: | ★★★★★ 100 |
| MARKET: | CONSUMER |
| CHANNELS: | |
| SOURCE: | DIRECT MAIL |
| PRIVACY: | UNKNOWN |
| DMAT: | YES - MEMBER |
| STATUS: | PREFERRED PROVIDER |
| GEO: | USA |
| GENDER: | 49% FEMALE 40% MALE |

**DESCRIPTION**

Mayo Foundation for Medical Education and Research.

Mayo Clinic newsletters are backed by a century of patient care medical research and experience at one of the world's foremost medical centers.

This eight page monthly newsletter provided reliable, accurate and practical information on today's health and medical news:  Fitness & exercise, medical treatment breakthroughs, nutrition & healthy eating, tips on treating and preventing hundreds of illnesses.

www.mayoclinic.com

Orders which need zip file breakouts of 10 or more will incur a $100/F fee.

**Subscriber Profiles:**
Mature - age 60+
College educated
Above average incomes

Catalog and fundraiser rates are available.

All orders cancelled after merge and/or mail date will be billed at full rental rate.  Orders cancelled prior to merge will be billed a $150/F fee plus $12/M run charges and all applicable selection charges.  List owner/manager needs to be notified of any cut backs or cancellations before the merge happens.

**SELECTS**

| | |
|---|---|
| 1 MONTH HOTLINE | $15.00/M |
| 3 MONTH HOTLINE | $10.00/M |
| 6 MONTH HOTLINE | $8.00/M |
| CHANGE OF ADDRESS | $10.00/M |
| GENDER/SEX | $10.00/M |
| SCF | $10.00/M |
| STATE | $10.00/M |
| ZIP | $10.00/M |

**ADDRESSING**

| | |
|---|---|
| KEY CODING | $10.00/M |
| CARTRIDGE (FLAT FEE) | $30.00/F |
| DISKETTE (FLAT FEE) | $75.00/F |
| EMAIL DELIVERY (FLAT FEE) | $75.00/F |
| FUNDRAISING/NON-PROFIT KEYING | $10.00/M |
| MODEM/FTP/BBS (FLAT FEE) | $75.00/F |
| RUN CHARGES | $12.00/M |
| ZIP TAPE (FLAT FEE) | $100.00/F |
| ZIP+4 | $3.00/M |

**RELATED LISTS**

WILAND NONPROFIT/FUNDRAISING/DONOR DATABASE
SPECIAL OLYMPICS INTERNATIONAL
AMERICAN LUNG ASSOCIATION DONOR MASTERFILE
ALZHEIMER'S DISEASE RESEARCH
CONSUMER REPORTS
SIMIOAUDIENCE
CONSUMER REPORTS ON HEALTH
LEUKEMIA & LYMPHOMA SOCIETY, THE
NATIONAL FOUNDATION FOR CANCER RESEARCH
AICR - AMERICAN INSTITUTE FOR CANCER RESEARCH DONORS

*See* **Exhibit A** hereto.

3.      By renting, selling, or otherwise disclosing for compensation the Private Purchase Information of its customers to third parties, without providing its customers prior notice of such practices, Mayo violated the NISNPIA.  Subsection 2 of the NISNPIA provides:

> A commercial entity may not disclose nonpublic personal information that the commercial entity obtained on or after January 1, 2004, as a result of a consumer transaction if the commercial entity fails to comply with [the provisions requiring that prior notice of such disclosures be provided to the consumer, as set forth in] Section 13-37-201.

Utah Code Ann. § 13-37-202(1).

4.      Accordingly, Plaintiff brings this First Amended Class Action Complaint against Mayo for its intentional, systematic, and unlawful disclosures of its customers' Private Purchase Information in violation of the NISNPIA.

## NATURE OF THE CASE

5.      To supplement its revenues, Mayo rents and sells (for money), exchanges (for other valuable consumer data), and otherwise discloses for compensation its customers' information—including their full names, home addresses, and fact that they are purchasers of Defendant's publications (collectively "Private Purchase Information"), as well as other personal information such as

gender—to data aggregators, data appenders, data cooperatives, list brokers, political organizations, aggressive direct-mail advertisers, non-profit organizations, and other third parties without the written consent of its customers.

6.     Mayo's disclosure of Private Purchase Information and other individualized information is not only unlawful, but also dangerous because it allows for the targeting of particularly vulnerable members of society.

7.     While Mayo profits handsomely from the unauthorized rentals, sales, and/or other compensation-driven disclosures of its customers' Private Purchase Information, it does so at the expense of its customers' statutory privacy rights (afforded by the NISNPIA) because Mayo does not provide any prior notice of such disclosures to its customers (much less obtain their consent) before disclosing their Private Purchase Information to third parties for compensation.

## <u>PARTIES</u>

### I.     **Plaintiff Sherry Teresa**

8.     Plaintiff Sherry Teresa is a natural person and a citizen and resident of Springdale, Utah.

9.     On or after January 1, 2004, while a resident of and physically present in Utah, Plaintiff purchased one or more subscriptions to *Mayo Clinic Health Letter* from Defendant. Such subscriptions were subsequently sent by Defendant to Plaintiff's address in Utah.

10.     Prior to and at the time Plaintiff made her purchases, Mayo did not notify Plaintiff that it rents, sells, exchanges, or otherwise discloses for compensation its customers' Private Purchase Information to third parties, and Plaintiff has never authorized Mayo to do so.

11.     After such purchases were made, and during the applicable statutory period, Mayo disclosed, without providing Plaintiff the prior notice required by Utah Code Ann. § 13-37-201, Plaintiff's Private Purchase Information to data aggregators, data appenders, and/or data cooperatives, who then supplemented that information with data from their own files.

12.     Moreover, during that same period, Mayo rented, sold, exchanged, or otherwise disclosed for compensation lists containing Plaintiff's Private Purchase Information to third parties seeking to contact Mayo's customers for their own independent business purposes.

## II.     Defendant Mayo Foundation for Medical Education and Research

13.     Defendant Mayo Foundation for Medical Education and Research is a Minnesota corporation that maintains its headquarters and principal place of business in Rochester, Minnesota.

14.     Mayo has one or more office(s) or other place(s) of business in Utah, including but not limited to at 15 West South Temple, Suite 600, Salt Lake City, Utah (a location overseen by Mayo's registered agent on Mayo's behalf).

Additionally, Mayo has employees who work for Mayo from Utah (and thus conduct business on Mayo's behalf at places in Utah).

15.     Mayo does business throughout Utah and the entire United States and, in the ordinary course of its business, enters into transactions with consumers in Utah.

16.     Mayo is the publisher of various medical books and other publications, including but not limited to the *Mayo Clinic Health Letter* magazine.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

18.     The Court has personal jurisdiction over Mayo because Plaintiff's claims arose in substantial part from actions and omissions in Utah, including from Plaintiff's purchases of subscriptions to Defendant's *Mayo Clinic Health Letter* magazine while Plaintiff resided in Utah, Mayo's direction of such consumer products into Utah, and Mayo's failure to provide to Plaintiff, in Utah, the notice required by Utah Code Ann. § 13-37-201 before disclosing her Private Purchase Information, including her residential address in Utah, to other persons, the effects

of which were felt from within Utah by a citizen and resident of Utah.  Personal jurisdiction also exists over Mayo in Utah because Mayo is registered to do business in Utah, maintains one or more office(s) or other place(s) of business in Utah (including a location overseen by its registered agent and places where its employees conduct Mayo business), and conducts substantial business within Utah, such that Mayo has significant, continuous, and pervasive contacts with Utah.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff resides in this judicial District, Mayo does substantial business in this judicial District, Mayo is subject to personal jurisdiction in this judicial District, and a substantial part of the events giving rise to Plaintiff's claims took place within this judicial District.

## **FACTUAL BACKGROUND**

### *Utah's Notice of Intent to Sell Nonpublic Personal Information Act*

20.     Pursuant to the NISNPIA, "[a] commercial entity may not disclose nonpublic personal information that the commercial entity obtained on or after January 1, 2004, as a result of a consumer transaction if the commercial entity fails to comply with Section 13-37-201." Utah Code Ann. § 13-37-202.

21.     A "commercial entity" is a person that "has an office or other place of business located in [Utah]" and "in the ordinary course of business transacts a consumer transaction in [Utah]." *Id.* § 13-37-102(2)(a).

22.     "Consumer transaction" means, *inter alia*, "a sale, lease, assignment, award by chance, or other written or oral transfer or disposition . . . of[] goods[,] services[,] or other tangible or intangible property, . . . that is initiated or completed in [Utah]." *Id.* § 13-37-102(4)(a)(i).

23.     "Nonpublic personal information" means "information that . . . is not public information" and, "either alone or in conjunction with public information, identifies a person in distinction from other persons." *Id.* § 13-37-102(5)(a). "Nonpublic personal information" expressly includes, *inter alia*, "the purchasing patterns of a person" or "the personal preferences of a person." *Id.* § 13-37-102(5)(b)(iii)-(iv).

24.     A commercial entity "is considered to have obtained information as a result of a consumer transaction if . . . the person provides the information to the commercial entity . . . at any time during the consumer transaction . . . and at the request of the commercial entity," or if "the commercial entity otherwise obtains the information . . . and but for the consumer transactions, the commercial entity would not obtain the information." *Id.* § 13-37-201(1)(b).

25.     Section 13-37-201 of the NISNPIA requires a commercial entity to provide the consumer with a notice, in the form set forth in that section, if "the commercial entity enters into a consumer transaction with that person[,]" "as a result of the consumer transaction . . . , the commercial entity obtains nonpublic

personal information concerning that person[,] and "the commercial entity intends to or wants the ability to disclose the nonpublic personal information . . . to a third party . . . for compensation," where such compensation "is the primary consideration for the commercial entity disclosing the nonpublic personal information," is "directly related to the commercial entity disclosing the nonpublic personal information," and "is not compensation received by the commercial entity in consideration of a transaction [wherein a third party provides the commercial entity with: "(i) services, including business outsource services; (ii) personal or real property; or (iii) other thing of value"])." *Id.* § 13-37-201(1)(a); § 13-37-201(5).

26.     The notice required by section 13-37-201 of the NISNPIA "shall read substantially as follows: 'We may choose to disclose nonpublic personal information about you, the consumer, to a third party for compensation." )." *Id.* § 13-37-201(3)(a).   The notice may be provided either "orally, if the consumer transaction itself is entirely conducted orally[,] or . . . in writing, if the notice is written in dark bold." *Id.* § 13-37-201(3)(b).   In either case, the notice "shall be sufficiently conspicuous so that a reasonable person would perceive the notice before providing the nonpublic personal information."   *Id.* § 13-37-201(3)(c). The notice "shall be given before the earlier of . . . the point at which the person is requested to provide the nonpublic personal information[] or . . . the commercial entity otherwise obtains the nonpublic personal information as a result of the

consumer transaction[.]" *Id.* § 13-37-201(2).

27.     The NISNPIA entitles consumers who suffer violations of the statute to recover, *inter alia*, "$500 for each time the commercial entity fails to provide the notice required by this section in relation to the nonpublic personal information of the person who brings the action." *Id.* § 13-37-203.

28.     Despite the fact that Mayo has initiated or completed thousands of sales of its products to consumers in Utah, Mayo disregarded its legal responsibility to these individuals by systematically disclosing their Private Purchase Information to third parties for compensation, in clear violation of the NISNPIA.

### The Private Information Market:
### Consumers' Private Information Has Real Value

29.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[1]

30.     More than two decades later, Commissioner Swindle's comments ring

---

[1]     **Exhibit B**, The Information Marketplace:   Merging and Exchanging Consumer Data (Mar. 13, 2001), at 8:15-11:16, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited Feb. 29, 2024).

truer than ever, as consumer data feeds an information marketplace that supports a

$26 billion dollar per year online advertising industry in the United States.[2]

31.    The FTC has also recognized that consumer data possesses inherent

monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types
> and amount of information collected by businesses, or why
> their information may be commercially valuable. Data is
> currency. The larger the data set, the greater potential for
> analysis—and profit.[3]

32.    In fact, an entire industry exists while companies known as data

aggregators purchase, trade, and collect massive databases of information about

consumers.  Data aggregators then profit by selling this "extraordinarily intrusive"

information in an open and largely unregulated market.[4]

33.    The scope of data aggregators' knowledge about consumers is

immense: "If you are an American adult, the odds are that [they] know[] things like

---

[2]    *See* **Exhibit C**, Web's Hot New Commodity: Privacy, WSJ (Feb. 28, 2011),
http://online.wsj.com/article/SB10001424052748703529004576160764037920274
.html (last visited Feb. 29, 2024).

[3]    **Exhibit D**, Statement of FTC Commissioner Pamela Jones Harbour (Dec.
7, 2009), at 2, *available at*
https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-
exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited Feb. 29,
2024).

[4]    *See* **Exhibit E**, Martha C. White, *Big Data Knows What You're Doing Right
Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-
knows-what-youre-doing-right-now/ (last visited Feb. 29, 2024).

your age, race, sex, weight, height, marital status, education level, politics, buying

habits, household health worries, vacation dreams—and on and on."[5]

34.     Further, "[a]s use of the Internet has grown, the data broker industry

has already evolved to take advantage of the increasingly specific pieces of

information about consumers that are now available."[6]

35.     Recognizing the serious threat the data mining industry poses to

consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-

Partisan Privacy Caucus sent a letter to nine major data brokerage companies

seeking information on how those companies collect, store, and sell their massive

collections of consumer data.[7]

36.     In their letter, the co-Chairmen recognized that "[b]y combining data

---

[5]     **Exhibit F**, Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* https://www.immagic.com/eLibrary/ARCHIVES/GENERAL/GENPRESS/N120616S.pdf (last visited Feb. 29, 2024).

[6]     **Exhibit G**, Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited Feb. 29, 2024).

[7]     *See* **Exhibit H**, *Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited Feb. 29, 2024).

from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer," which "raises a number of serious privacy concerns."[8]

37.    Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams,[9] including fraudulent sweepstakes, charities, and buying clubs.  Thus, when companies like Mayo share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases" of consumer data that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[10]

38.    Information disclosures like those made by Mayo are particularly dangerous to the elderly.  "Older Americans are perfect telemarketing customers,

---

[8]      *Id.*

[9]      *See* **Exhibit I**, *Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited Feb. 29, 2024).

[10]     **Exhibit J**, Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times, May 20, 2007, *available at* http://www.nytimes.com/2007/05/20/business/20tele.html (last visited Feb. 29, 2024).

analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[11]  The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[12] Indeed, an entire black market exists where the private information of vulnerable elderly Americans is exchanged.

39.    Thus, information disclosures like Mayo's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is of Mayo bombarded with similar fraudulent offers from a host of scam artists."[13]

40.    Mayo is not alone in jeopardizing its customers' privacy and well-being in exchange for increased revenue: disclosing customer information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties for compensation is a widespread practice in consumer-products industries.

41.    Thus, as consumer data has become an ever-more valuable

---

[11]    *Id.*

[12]    **Exhibit K**, *Fraud Against Seniors:  Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at*  https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf  (last visited Feb. 29, 2024).

[13]    *See id.*

commodity, the data mining industry has experienced rapid and massive growth. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

### Consumers Place Monetary Value on Their Privacy and Consider Privacy Practices When Making Purchases

42.     As the data aggregation and cooperative industry has grown, so too have consumer concerns regarding the privacy of their information.

43.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[14]  As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[15]

44.     Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.

---

[14]     *See* **Exhibit L**, *2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, *available at* x https://digitalcontentnext.org/blog/2014/07/16/truste-2014-us-consumer-confidence-privacy-report/ (last visited Feb. 29, 2024).

[15]     *Id.*

45.     In fact, consumers' private information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their information themselves.[16]

46.     These companies' business models capitalize on a fundamental tenet underlying the consumer information marketplace: consumers recognize the economic value of their private data.  Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their data.[17]

47.     Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[18]

### *Mayo Unlawfully Rents and Otherwise Discloses for Compensation Its*

---

[16]     *See* **Exhibit M**, Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited Feb. 29, 2024).

[17]     *See* **Exhibit N**, European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited Feb. 29, 2024), citing Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011).

[18]     *See* **Exhibit O**, Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* https://econwpa.ub.uni-muenchen.de/econ-wp/io/papers/0304/0304001.pdf  (last visited Feb. 29, 2024) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.").

*Customers' Private Purchase Information*

48.     Mayo maintains a vast digital database comprised of its customers' Private Purchase Information.  Mayo discloses for compensation its customers' Private Purchase Information to data aggregators and appenders, who then supplement that information with additional personal information about each of its customers, including his or her gender.  (*See, e.g.*, **Exhibit A**).

49.     Mayo then rents, exchanges, and/or otherwise discloses for compensation its customer lists—which include all of its customers' Private Purchase Information, identifying which individuals purchased Mayo's publications, and can include the other sensitive information obtained from data aggregators and appenders—to other data aggregators and appenders, direct-mail advertisers, consumer-facing businesses, non-profit organizations seeking to raise awareness and solicit donations, and political organizations soliciting donations, votes, and volunteer efforts. (*See* **Exhibit A**).

50.     Mayo also discloses for compensation its customers' Private Purchase Information to data cooperatives, who in turn give Mayo access to their own list databases.

51.     In short, Mayo disclosed and continues to disclose its customers' Private Purchase Information to anybody willing to pay for it.

52.     As a result of Mayo's data compiling and sharing practices, companies

can purchase, rent, exchange for, or otherwise obtain mailing lists from Mayo that identify Mayo's customers by their most intimate details, including their personal preferences and purchasing habits. Mayo's disclosures of such sensitive and private information to any member of the public interested in purchasing it is invasive of its customers' privacy and intrusive upon their private affairs and concerns (in a way that the average person would find highly offensive). Mayo's disclosures also put its customers at risk of serious harm from scammers.

53.    Mayo failed to provide prior notice of these disclosures to its customers as required by Utah Code Ann. 13-37-201, much less obtain their consent prior to making such disclosures. As a result, Mayo's customers in Utah (and elsewhere throughout the country) remain unaware that their Private Purchase Information and other sensitive information is being rented, sold, and otherwise disclosed for compensation on the open market.

54.    Consumers purchase Mayo's products through numerous media outlets, including the Internet, telephone, or traditional mail. Regardless of how the consumer makes a purchase, during the applicable statutory period Mayo uniformly failed to provide the notice required by Utah Code Ann. 13-37-201 to – much less obtain any form of consent from – its Utah-based customers before they made purchases from Mayo or before Mayo disclosed their Private Purchase Information to third parties for compensation.

55.     By and through these actions, Mayo has disclosed to third parties its Utah-based customers' Private Purchase Information for compensation without providing the requisite prior notice of such disclosures, in direct violation of the NISNPIA.

## CLASS ACTION ALLEGATIONS

56.     Plaintiff seeks to represent a class defined as all persons in Utah who had their Private Purchase Information obtained by Mayo on or after January 1, 2004 as a result of a consumer transaction and who, at any point during the applicable statutory period, had such Private Purchase Information disclosed by Mayo to one or more third party (the "Class").  Excluded from the Class is any entity in which Mayo has a controlling interest, and officers or directors of Mayo.

57.     Members of the Class are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class number in the thousands.   The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Mayo.

58.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to: (a) whether Mayo is a

20

"commercial entity" within the meaning of the NISNPIA; (b) whether Mayo provided the notice required by the NISNPIA to Plaintiff and Class members before they entered into consumer transactions with Mayo; (c) whether Mayo obtained Plaintiff's and Class members' Private Purchase Information as a result of consumer transactions, and whether such information constitutes "nonpublic personal information" within the meaning of the NISNPIA; (d) whether Mayo disclosed Plaintiff's and Class members' Private Purchase Information to a third party; and (e) whether Mayo's disclosures of Plaintiff's and the Class's Private Purchase Information to third parties violated the NISNPIA.

59.     The claim of the named Plaintiff is typical of the claims of the Class in that the named Plaintiff and the members of the Class all suffered invasions of their statutorily protected right to privacy (as afforded by the NISNPIA), as well as intrusions upon their private affairs and concerns that would be highly offensive to a reasonable person, as a result of Mayo's uniform wrongful conduct in intentionally disclosing their Private Purchase Information to third parties for compensation.

60.     Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiff and her counsel.

61.    The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Mayo's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Mayo's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CAUSE OF ACTION
### Violation of Utah's Notice of Intent to Sell
### Nonpublic Personal Information Act
### (Utah Code Ann. § 13-37)

62.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

63.    Plaintiff brings this claim individually and on behalf of members of the Class against Mayo.

64.    Mayo has one or more office(s) or other place(s) of business in Utah, including but not limited to at 15 West South Temple, Suite 600, Salt Lake City,

Utah (a location overseen by Mayo's registered agent on Mayo's behalf). Additionally, Mayo has employees who work for Mayo from Utah (and thus conduct business on Mayo's behalf at places in Utah). And in the ordinary course of its business, Mayo enters into transactions with consumers in Utah. Accordingly, Mayo is a "commercial entity" within the meaning of the NISNPIA. *See* Utah Code Ann. § 13-37-102(2)(a).

65.     Mayo's sales of tangible and/or intangible property to Plaintiff, including subscriptions to its *Mayo Clinic Health Letter* magazine, were initiated or completed in Utah, where Plaintiff resided at the time she purchased her subscriptions and where she received her subscriptions in the mail. Accordingly, Mayo entered into one or more "consumer transaction" with Plaintiff within the meaning of the NISNPIA. *See id.* § 13-37-102(4)(a)(i).

66.     As a result of such consumer transactions, Mayo obtained information pertaining to Plaintiff that Plaintiff provided at Mayo's request, and which Mayo would not otherwise have obtained but for entering into such consumer transactions with Plaintiff. *See id.* § 13-37-201(1)(b). This information, referred to herein as Plaintiff's Private Purchase Information, included Plaintiff's "purchasing habits" and "personal preferences" within the meaning of the NISNPIA.

67.     At various times during the applicable statutory period, Mayo disclosed Plaintiff's Private Purchase Information, which identified her as a purchaser of

Mayo's *Mayo Clinic Health Letter* magazine, in at least three ways.

68. First, Mayo disclosed customer lists containing Plaintiff's Private Purchase Information to data aggregators and data appenders, who then supplemented the lists with additional sensitive information from their own databases, before sending the lists back to Mayo.

69. Second, Mayo disclosed mailing lists containing Plaintiff's Private Purchase Information to data cooperatives, who in turn gave Mayo access to their own consumer list databases.

70. Third, Mayo rented, sold, exchanged, and/or otherwise disclosed its customer lists containing Plaintiff's Private Purchase Information—enhanced with additional information from data aggregators and appenders—to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes.

71. Because many of Mayo's customer lists included the additional information from the data aggregators and appenders, the lists were more valuable and Mayo was able to increase its profits gained from the list rentals and/or exchanges.

72. Mayo made each disclosure of Plaintiff's Private Purchase Information, to each of the entities described in the preceding paragraphs, for compensation – namely, money. Indeed, Mayo's disclosures of Plaintiff's Private Purchase

Information were made to data aggregators, data appenders, data cooperatives, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes—all in order to increase Mayo's revenue.

73.     The information Mayo disclosed indicates Plaintiff's name and address, as well as the fact that she purchased one or more subscription to *Mayo Clinic Health Letter*, which was information not otherwise in the public domain. *See id.* § 13-37-102(5). Because the records or information disclosed by Mayo reveal Plaintiff's "purchasing patterns" and "personal preferences," and "identif[y] [Plaintiff] in distinction from other persons," the records or information Mayo disclosed to third parties constitute "nonpublic personal information" within the meaning of the NISNPIA. *See id.* § 13-37-102(5).

74.     Neither Plaintiff nor any member of the Class consented to Mayo disclosing their Private Purchase Information to anyone.

75.     Worse yet, at no time before entering into consumer transactions with Mayo or providing Mayo with their Private Purchase Information did Plaintiff or any members of the Class receive the notice required by Utah Code Ann. § 13-37-201. Specifically, prior to entering into consumer transactions with Plaintiff and Class members and obtaining Plaintiff's and Class members' Private Purchase Information,  Mayo failed to provide Plaintiff or any members of the Class with a clear and conspicuous notice in dark bold writing (or orally), such that a reasonable

person would perceive the notice, stating that "[w]e may choose to disclose nonpublic personal information about you, the consumer, to a third party for compensation." *Id.* § 13-37-201(3)(a).

76.    Plaintiff and the members of the Class never otherwise consented to Mayo disclosing their Private Purchase Information to anyone.

77.    Mayo's undisclosed, nonconsensual disclosures of all of its customers' Private Purchase Information intruded substantially upon the solitude and seclusion (including the personal affairs and concerns) of Plaintiff and each of the Class members, in a way that was highly offensive to Plaintiff and would be highly offensive to a reasonable person, including the members of the Class.

78.    Mayo's disclosures of Plaintiff's and the Class's Private Purchase Information were not made to third parties in "relat[ion] to the third part[ies] providing to [Mayo] . . . services, including business outsource services[,] personal or real property[,] or other thing[s] of value," and the "compensation received by [Mayo] as part of the transaction[s] [with third parties] [was not] received by [Mayo] for or in consideration of such "third part[ies] providing to [Mayo] [such] services, . . . personal or real property[,] or other thing[s] of value." *Id.* § 13-37-201(5).

79.    Mayo is not "subject to a federal law or regulation that governs the disclosure of nonpublic information to a third party," nor is Mayo "a covered entity as defined in 45 C.F.R. Parts 160 and 164." *See* Utah Code Ann. § 13-37-201(4).

80.     By disclosing Plaintiff's and the Class's Private Purchase Information to third parties for compensation, without providing prior notice to Plaintiff or Class members as required by Utah Code Ann. § 13-37-201, Mayo violated Plaintiff's and the Class's statutorily protected right to privacy in their nonpublic personal information pertaining to their consumer transactions, as afforded by the NISNPIA. *See id.* § 13-37-202(1) ("A commercial entity may not disclose nonpublic personal information that the commercial entity obtained on or after January 1, 2004, as a result of a consumer transaction if the commercial entity fails to comply with Section 13-37-201.").

81.     On behalf of herself and the Class, Plaintiff seeks: (1) $500.00 to Plaintiff and each Class member, for each time Defendant failed to provide them the notice required by the NISNPIA in relation to their Private Purchase Information, pursuant to Utah Code Ann. § 13-37-203(2)(a); and (2) costs pursuant to Utah Code Ann. § 13-37-203(2)(b).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks a judgment against Defendant as follows:

A.     For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as a representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

B.     For an order declaring that Defendant's conduct as

described herein violated Utah's Notice of Intent to Sell Non-Public Information Act;

C.      For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

D.      For an award of $500.00 to Plaintiff and each Class member, for each time Defendant failed to provide them the notice required by the NISNPIA in relation to their Private Purchase Information, as provided by the NISNPIA, Utah Code Ann. § 13-37-203(2)(a);

E.      For prejudgment interest on all amounts awarded; and

F.      For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit pursuant to Rule 23 and Utah Code Ann. § 13-37-203(2)(b).

## **JURY DEMAND**

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: July 15, 2024                    Respectfully submitted,

PETERS | SCOFIELD
*A Professional Corporation*

/s/ David W. Scofield
DAVID W. SCOFIELD

FRANK S. HEDIN*
ARUN G. RAVINDRAN*
**HEDIN LLP**
1395 Brickell Avenue, Suite 1140
Miami, Florida 33131
Tel: 305.357.2107
fhedin@hedinllp.com
aravindran@hedinllp.com

28

E. POWELL MILLER (*PRO HAC VICE*)
**THE MILLER LAW FIRM, P.C.**
950 W. University Drive, Suite 300
Rochester, MI 48307
Tel: 248.841.2200
epm@millerlawpc.com

* Pro Hac Vice App. Forthcoming

*Counsel for Plaintiff and Putative Class*