Frank S. Hedin (Pro Hac Vice Application Pending)
**HEDIN LLP**
1395 Brickell Avenue, Suite 610
Miami, Florida 33131
Tel: 305.357.2107
Fax: 305.200.8801
fhedin@hedinllp.com

David W. Scofield – 4140
**PETERS | SCOFIELD**
*A Professional Corporation*
7430 Creek Road, Suite 303
Sandy, Utah 84093-6160
Telephone:     (801) 322-2002
Facsimile:      (801) 912-0320
E-Mail:          dws@psplawyers.com

*Attorneys for Plaintiffs and the Putative Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| SHERRY TERESA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MAYO FOUNDATION FOR MEDICAL EDUCATION AND RESEARCH,<br><br>Defendant. | **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**<br><br><br>Case No. 2:23-cv-00878-HCN-DAO<br><br>District Judge Ann Marie McIff Allen<br>Magistrate Judge Paul Kohler |

## INTRODUCTION

In this class action, Plaintiff alleges in her First Amended Complaint ("FAC") that Mayo rented and sold, exchanged, and otherwise disclosed for compensation Plaintiff's and all of its other Utah customers' nonpublic personal information – including information Defendant had gathered in connection with Plaintiff's subscription to the *Mayo Clinic Health Letter* – to any third party interested in acquiring it, such as data aggregators, data appenders, data cooperatives, and aggressive advertisers. The nonpublic personal information Defendant disclosed included Plaintiff's full name, home address, the fact that she subscribed to *Mayo Clinic Health Letter,* details concerning her subscription, and other categories of individualized data and demographic information including her gender. And egregiously, Defendant made these disclosures without providing Plaintiff or any of its other Utah customers prior notice that it would do so. By disclosing Plaintiff's nonpublic personal information to third parties for compensation without first providing Plaintiff clear and conspicuous notice of these practices (and thus an opportunity not to be subjected to them before she subscribed), Defendant violated Utah's Notice of Intent to Sell Nonpublic Personal Information Act, Utah Code § 13-37-101, *et. seq*. (the "NISNPIA").

Mayo argues for dismissal of the FAC on four grounds: *first*, that this Court lacks subject matter jurisdiction because NISNPIA purports to bar class actions; *second*, that Plaintiff does not meet the Class Action Fairness Act's ("CAFA") $5,000,000 amount-in-controversy threshold; *third*, that Plaintiff and the class lack Article III standing; and *fourth*, that the FAC fails to state a claim because Mayo denies it is a "commercial entity" under the NISNPIA statute. Each of Defendant's arguments is meritless.

First, Defendant's argument concerning NISNPIA's purported class action bar is in derogation of Supreme Court precedent. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010) (holding that state law class action bars like the one in the NISNPIA are preempted before federal courts sitting in diversity). In a recent thorough and well-reasoned decision, Judge Parrish methodically applied *Shady Grove's* preemption analysis to NISNPIA, holding, under identical facts as here, that because NISNPIA's class action bar "is not part of

1

Utah's framework of substantive rights and remedies" Rule 23 preempts NISNPIA's class action bar and plaintiffs may bring a NISNPIA class action in federal courts. *Curry v. Mrs. Fields Gifts, Inc.*, No. 2:22-cv-00651-JNP-DBP, 2023 WL 6318108, at *1 (D. Utah Sept. 28, 2023) (unpublished). This Court should follow *Curry*'s reasoning and find the same.

Second, Defendant's argument that the FAC should be dismissed because this action cannot meet CAFA's $5,000,000 amount-in-controversy threshold is baseless. Defendant fails to demonstrate to a "legal certainty" that Plaintiff cannot meet this threshold. Defendant proffers that the damages in this case amount to, at most, $3.8 million based on its assertion that there are 7,633 unique class members (the number of Utahns between only 2023 and 2024, whose nonpublic personal information Defendant admits it sold or rented). But Defendant incorrectly assumes that each class member is entitled to a statutory damage award of just $500, when in reality the vast majority of class members are entitled to many multiples of that amount. This is because NISNPIA entitles a person whose information was sold or disclosed to a third party to $500 in damages for each purchase that the person made since January 1, 2004 without first receiving the notice specified in section 13-37-201. And here, the FAC alleges, and Defendant presents no evidence to refute, that it uniformly failed to provide the mandated notice to anyone, including any member of the class, before anyone made a purchase on or after January 1, 2004 or at any other time before Defendant rented and sold all of its customers' information to third parties. Given that the vast majority of class members made multiple purchases of subscriptions to Defendant's publications on a recurring basis over the years since 2004, the amount in controversy in this case plainly exceeds $5 million in the aggregate. Additionally, under Utah law, the applicable statute of limitations for NISNPIA claims is three years, not one year as Defendant also assumes in the Motion. Thus, Defendant comes nowhere close to establishing with any degree of certainty (much less with the "legal certainty" necessary to prevail on this issue) that the Class cannot recover more than $5,000,000 in the aggregate.

Third, with respect to Article III standing, Defendant's disclosures of Plaintiff's nonpublic personal information concretely harmed the very privacy interests the NISNPIA statute confers to

Utah consumers – namely, preventing unauthorized disclosures of their nonpublic personal information to third parties for compensation and being free from intrusions into one's private affairs and concerns (including personal preferences and purchasing habits). Again, Judge Parrish's thorough and thoughtful analysis of the identical argument in *Curry v. Mrs. Fields Gifts, Inc.*, 2024 WL 3794487, at *3-5 (D. Utah Aug. 13, 2024) (unpublished) [hereinafter "*Curry II*"] is instructive. In *Curry II*, Judge Parrish recognized that disclosures materially similar to those alleged in this case harmed privacy interests well rooted in common law, and NISNPIA's passage reflects the determination of the Utah legislature to protect those interests from infringement. Here, Defendant's infringement of Plaintiff's concrete privacy interests afforded by NISNPIA – in preventing disclosures of nonpublic information and being free of intrusions into their personal affairs – manifested intangible harm sufficient to satisfy Article III.

Fourth, Defendant's argument that it is not subject to NISNPIA because it is not domiciled in Utah and, therefore, not a "Commercial Entity" covered by the statute is baseless. The statute does not require that a defendant be domiciled in Utah. Rather, it requires only that a defendant have an office or place of business in Utah and have conducted a consumer transaction in Utah in the ordinary course of business, both of which the FAC alleges.

The Court has subject matter jurisdiction, and the FAC adequately states a claim for violation of NISNPIA. The Motion should be denied in its entirety.

### THE PERTINENT STATUTORY SCHEME

Pursuant to the NISNPIA, "[a] commercial entity[1] may not disclose nonpublic personal information[2] that the commercial entity obtained on or after January 1, 2004, as a result of a

---

[1] A "commercial entity" is a person that "has an office or other place of business located in [Utah]" and "in the ordinary course of business transacts a consumer transaction in [Utah]." *Id.* § 13-37-102(2)(a).

[2] "Nonpublic personal information" means "information that . . . is not public information" and, "either alone or in conjunction with public information, identifies a person in distinction from other persons." *Id.* § 13-37-102(5)(a). "Nonpublic personal information" expressly includes, *inter alia*, "the purchasing patterns of a person" or "the personal preferences of a person." *Id.* § 13-37-102(5)(b)(iii)-(iv) (emphasis added).

consumer transaction[3] if the commercial entity fails to comply with Section 13-37-201." Utah Code § 13-37-202. Section 13-37-201, in turn, requires a commercial entity to provide the consumer with notice if "the commercial entity enters into a consumer transaction with that person[,]" "as a result of the consumer transaction … the commercial entity obtains nonpublic personal information concerning that person[,]" and "the commercial entity intends to or wants the ability to disclose the nonpublic personal information … to a third party … for compensation," where such compensation "is the primary consideration for the commercial entity disclosing the nonpublic personal information," and is "directly related to the commercial entity disclosing the nonpublic personal information[.]" *Id.* § 13-37-201(1)(a); § 13-37-201(5).

## ARGUMENT

### I.      NISNPIA's Class Action Bar Is Preempted by Rule 23

Section 203(3) of the NISNPIA provides that "a person may not bring a class action under this chapter." Utah Code § 13-37-203(3). Under *Shady Grove*, state law class action bars like the one in NISNPIA are preempted before federal courts sitting in diversity unless preemption would abridge, enlarge, or modify state law rights or remedies. *Shady Grove*, 559 U.S. at 393.

In a nuanced and thorough decision in *Curry*, Judge Parrish considered the same arguments and authorities cited here and held that Rule 23 preempts NISNPIA's class action bar and such actions are cognizable as class actions in federal courts. This Court should follow suit.

In *Shady Grove*, Justice Stevens, in concurrence, set forth a two-step analysis to evaluate the preemption of a New York statutory provision restricting class actions in a diversity action in federal court.[4] Step one considers whether the applicable Federal Rule of Civil Procedure – here Rule 23 – and the state rule at issue – here Section 203(3)'s class action bar – are "reconcilable," *Stender v. Archstone-Smith Operating Tr.*, 958 F.3d 938, 947 (10th Cir. 2020), or, stated

---

[3] "Consumer transaction" means, *inter alia*, "a sale, lease, assignment, award by chance, or other written or oral transfer or disposition … of[] goods[,] services[,] or other tangible or intangible property, … that is <u>initiated or completed in [Utah]</u>." *Id.* § 13-37-102(4)(a)(i) (emphasis added).

[4] The Tenth Circuit has held that Justice Stevens' *Shady Grove* concurrence is controlling. *Garman v. Campbell Cty. Sch. Dist. No. 1*, 630 F.3d 977, 985 (10th Cir. 2010).

differently, whether the federal rule and state statue are in "direct collision." *Shady Grove*, 559 U.S. at 421. Step two considers whether, if there is a direct collision between the federal procedural rule and the state statutory provision, would application of the federal procedural rule pose a Rules Enabling Act problem: would that rule "effectively abridge[], enlarge[], or modif[y] a state-created right or remedy." *Id.* at 422. Justice Stevens explicitly recognized that, as to this second step, "the bar for finding an Enabling Act problem is a high one" and reiterated that "[t]he mere possibility that a federal rule would alter a state-created right is not sufficient. There must be little doubt. . . . [S]ome effect on the outcome of litigation" is not enough. *Id.* at 432-33.

Faithfully applying this two-step approach, Judge Parrish found at Step 1 that "[b]y their plain text, Rule 23 and § 203(3) are in direct, unavoidable conflict. Under the former, a class action 'may be maintained.' [Rule 23(b)]. Under the latter, a class action 'may *not*' be brought by a person. Utah Code 13-37-203(3)." *Curry*, 2023 WL 6318108, at *2.[5]

Judge Parrish's analysis of *Shady Grove*'s second step recognized that the inquiry looks "to the state statute at issue to differentiate between rights and remedies on the one hand, and procedures on the other, to ensure that Rule 23 does not overstep the boundaries of the Rules Enabling Act or interfere with states' ability to determine the 'dimensions' of a state-created claim." *Curry*, 2023 WL 6318108, at *6. This analysis was purely textual:

> This issue can be resolved by reference to the relevant statutory "text and context" alone. Utah's NISNPIA, including § 203, labeled "Liability," at issue here, is cleanly divisible into rights, remedies, and procedures. Surgical removal of the presumptively procedural class-action bar leaves the rights and remedies otherwise provided by the Act totally intact.

---

[5] Defendant cites *Fullmer v. A-1 Collection Agency*, 2022 WL 1538675, at *3 (D. Utah May 16, 2022) (unpublished), which found Rule 23 was permissive because it uses the word "may" in the phrase "may be maintained." However, as Judge Parrish correctly noted in *Curry*, *Shady Grove*'s majority holding forecloses that reading by describing Rule 23 as creating a categorical – as opposed to permissive – right for plaintiffs in federal court. *Curry*, 2023 WL 6318108, at *4. *Curry* also considered *Caligari v. Blendtec, Inc.*, 2018 WL 5808805 (D. Utah Nov. 6, 2018) (unpublished), also cited by Mayo, which found no conflict between NISNPIA's class action bar and Rule 23. *Curry*, 2023 WL 6318108, at *3. Judge Parrish found this case to be "neither binding nor persuasive" because the "*Shady Grove* majority opinion entirely forecloses such a proposition." *Id.*

In fact, § 203 itself is comprised of three subsections that neatly track these three categories: the first defines the dimensions of the claim and cause of action; the second defines the remedies available to litigants under the Act; and the third, of particular concern in this case, is a matter of procedure. At one greater degree of detail, § 203 is mapped out as follows: § 203(1) … provide[s] the *cause of action*— that is, the claim or right…

Section 203(2), in turn, creates the applicable remedy by defining what "a court can do for a litigant who has been wronged…by creating liability for violating commercial entities amounting to $500 "for each time the commercial entity fails to provide the notice required by this section in relation to the nonpublic personal information of the person who brings the action," along with court costs. UTAH CODE ANN. 13-37-203(2)(a)-(b).

Section 203(3), however, is neither a statement of rights nor one of remedies. It neither dictates what must be pleaded or proved as a cause of action, nor does it determine what a plaintiff *gets* should he prevail on such a claim. Instead, § 203(3) is entirely a matter of procedure, merely going to the preferred means of joinder and aggregation: "a classically procedural calibration of making it easier to litigate claims in [Utah] courts . . . only when it is necessary to do so, and not making it too easy when the class tool is not required." Utah has calibrated the ease of aggregating claims under NISNPIA one way through regulation of its state courts under the Act, and Congress has elected another calibration through Rule 23 in the government of federal courts. In both cases, however, the class action remains a quintessentially procedural claims-processing device and, in the specific case of NISNPIA, is separable from any elements of Utah's "framework of substantive rights and remedies," otherwise provided under that Act. [. . .]

[T]he availability of the procedural mechanism of the class action has "some effect on the outcome of litigation," . . . Given the feasibility of disentangling the procedural class-action bar from the rest of the Utah statute, while leaving the rights and remedies provided therein intact, this court finds that the "high" bar of finding a Rules Enabling Act violation has not been cleared.

*Curry*, 2023 WL 6318108, at *6.

Defendant argues that *Curry* does not give "adequate weight to Justice Steven's controlling analysis[.]" (Mot. at n. 4). But Judge Parrish applied Justice Steven's framework methodically. Defendant also suggests *Curry* is insufficiently "nuanced." (Mot. at 8). Not so. Indeed, if 5,000 members of a potential class action were all entitled to statutory damages under § 113-37-203, the scope of Defendant's liability would not be changed if the actions were brought individually instead of in a class action. Section 203 is plainly a severable claims processing rule applicable in Utah state court but with no effect before this Court. *Curry* parses the statute's text to answer the

fundamental question of whether § 203(3)'s class action bar is a procedural rule or a substantive component of rights and remedies under the statute.[6] It is procedural, and other cases are in accord.[7] There is simply no reason to conclude that the decision to include a class action bar reflected a legislative judgment on the scope of the rights or remedies conferred under the statute, much less sufficient justification to clear the high hurdle of finding a Rules Enabling Act problem.[8] Defendant offers no good reason for why the Court should find otherwise, and accordingly, the Motion should be denied.

## II.    Defendant's CAFA Jurisdiction Challenge Fails Because it Cannot Show to a "Legal Certainty" that the Amount in Controversy Does Not Exceed $5,000,000

Mayo's second argument is baseless. It rests on the erroneous premise that each class member is entitled to just $500 in statutory damages and that the NISNPIA limitation period is just one year. But the statute plainly entitles each class member to $500 multiplied by the number of times Mayo failed to provide the notice required by § 13-37-201 in connection with a purchase of Mayo's products between January 1, 2004 and the date on which the person's information was

---

[6] In *Delgado v. Ocwen Loan Servicing, LLC*, 2017 WL 5201079, at *9 (E.D.N.Y. Nov. 9, 2017) (unpublished) (Mot. at 10), the court did not undertake the same line-by-line analysis of the statutes' class action bars as in *Curry* and treated the location of the class action bar as dispositive. *Cf. Lisk v. Lumber One Wood Preserving*, 792 F.3d 1331, 1336 (11th Cir. 2015)

[7] *See, e.g.*, *In re Restasis Antitrust Litig.*, 355 F.Supp.3d 145, 156 (E.D.N.Y. 2018) ("Hawaii's law regulates only when private plaintiffs can litigate the case. It does not alter the substantive elements of plaintiffs' claims. … it is surely no more substantive than the statute at issue in *Shady Grove*, which barred class action suits for an entire category of claims."); *Los Lobos Renewable Power v. Americulture, Inc*, 885 F.3d 659, 670 (10th Cir. 2018) citing *Shady Grove* ("The New Mexico [anti-SLAPP] statute does not alter the rules of decision by which a court will adjudicate the merits of the complaint. The statute alter[s] only how the claims are processed.").

[8] Defendant cites *Murtagh v. Bed Bath & Beyond Inc.*, 2020 WL 4195126 (D. Colo. July 3, 2020) (unpublished) and *Friedman v. Dollar Thrifty Automotive Group, Inc.*, 2015 WL 8479746 (D. Colo. Dec. 10, 2015) (unpublished) (Mot. at 10) both of which applied a class action bar from Colorado's Consumer Protection Statute. These cases uncritically labeled the class action bar "substantive" without examining whether the bar was a procedural mechanism capable of being severed without impacting the balance of the statute's rights and remedies.

rented or sold to a third party. Thus, all such compensation-driven disclosures that Mayo made during the three-year period preceding the filing of the case are actionable.

"CAFA explicitly provides for aggregation of each class member's claims in determining whether the amount of controversy is at least $5,000,000." *Blockbuster, Inc. v. Galeno*, 472 F.3d 53, 59 (2d Cir. 2006). Pursuant to the "very strict" standard that applies to jurisdictional challenges based on the amount in controversy, the defendant bears the burden of establishing, with "certainty," that there is a "legal impossibility" of a class-wide recovery in excess of CAFA's threshold. *Woodmen of World Life Ins. Soc'y v. Manganaro*, 342 F.3d 1213, 1217 (10th Cir. 2003); *see also Id*, 342 F.3d at 1216-17 ("There is a strong presumption favoring the amount alleged by the plaintiff.").[9] Here, because each class member is entitled to a statutory damage award of $500 times the number of purchases made from Mayo between January 1, 2004 through the date on which Mayo sold or rented their nonpublic personal information to a third party, the only "legal certainty" capable of being drawn from the evidence accompanying the Motion is that the amount in controversy *far exceeds* CAFA's threshold in the aggregate – even under a one-year limitation period, much less the proper three-year period.

Specifically, the FAC alleges, and Defendant presents no evidence to refute, that between January 1, 2004 through the present, Defendant failed to provide the notice specified in § 13-37-

---

[9] Mayo argues Plaintiff must establish jurisdictional facts by a preponderance of the evidence (citing *McPhail v. Deere*, 529 F.3d 947, 954-55 (10th Cir. 2008) (Mot. at 12)), but that rule only applies to defendants seeking removal to federal court. *See id.* at 953 ("If an in-state plaintiff suing an out-of-state defendant wishes to be in federal court, all the plaintiff needs to do is allege an amount in excess of $75,000 and he will get his way, unless the defendant is able to prove 'to a legal certainty' that the plaintiff's claim cannot recover the alleged amount."); *Edelson PC v. Bandas L. Firm PC*, 2018 WL 723287, at *13 (N.D. Ill. Feb. 6, 2018) (unpublished) ("[Defendant argues] that the court does not have original jurisdiction, even under CAFA, because Plaintiff has not demonstrated that the amount in controversy is greater than CAFA's $5 million requirement…That requirement is satisfied, however, unless there is a legal certainty that [a potential] judgment will be less than the statutory threshold.).

201 to any of its customers before they made a purchase of any of Defendant's products. FAC ¶ 75. NISNPIA therefore prohibited Mayo, during the applicable limitation period, from renting or selling to third parties any of its Utah-based customers' nonpublic personal information it obtained in connection with customers' purchases after January 1, 2004.  *See* Utah Code § 13-37-202 (citing *id.*, § 13-37-201). The statute thus provides a cause of action to any Utah-based customer whose nonpublic personal information was sold, rented, or otherwise disclosed by Mayo during the applicable limitation period, and entitles each such person to an award of statutory damages in an amount calculated by multiplying $500 by the number of purchases made by the person on or after January 1, 2004 (each of which was made without it having first provided the customer with the notice required by section 13-37-201) through the date on which it sold, rented, or otherwise disclosed the person's nonpublic personal information to a third party, in addition to court costs. Utah Code § 13-37-203(1)(c) & *id.* 13-37-203(2)(a)-(b) (providing that "a commercial entity that violates this chapter is liable … for … <u>$500 for each time the commercial entity fails to provide the notice required by this section</u> in relation to the nonpublic personal information of the person[,]" in addition to "court costs") (emphasis added); FAC ¶ 81 ("On behalf of herself and the Class, Plaintiff seeks: (1) $500.00 to Plaintiff and each Class member, <u>for each time Defendant failed to provide them the notice required by the NISNPIA</u> in relation to their Private Purchase Information, pursuant to Utah Code § 13-37-203(2)(a); and (2) costs pursuant to Utah Code § 13-37-203(2)(b).") (emphasis added).

The declaration of Frank Castellvi of Commerce Register, Inc., one of Mayo's agents who facilitates the rental and sale of its customers' nonpublic personal information, states that there were "7,633 unique Utah-based Mayo Purchasers that had their information rented or sold between March 12, 2023-March 12, 2024." (Castellvi Decl. ¶ 8.). But Mayo fails to provide any evidence

reflecting the total number of purchases made by those 7,633 customers between January 1, 2004 and the date on which their nonpublic personal information was sold or rented to a third party. However, given that the purchases made by these persons were primarily subscriptions to Defendant's *Mayo Clinic Health Letter* publication – which is sold by it on a yearly basis, which customers typically purchase each year to renew, and which many customers purchase for both themselves and as gifts – it can reasonably be inferred that the total number of purchases made by these 7,633 customers (and thus the total number of times Defendant failed to provide these customers with the notice required by § 13-37-201) since January 1, 2004 is likely many times greater than 7,633.[10] *See, e.g.*, *Grange Mut. Cas. Co. v. Safeco Ins. Co. of Am.*, 565 F. Supp. 2d 779, 784-85 (E.D. Ky. 2008) (concluding that "the Court has jurisdiction to hear the action" because "it seems that when you combine the underlying damages and costs of [litigation]," the amount in controversy "very well could" meet the jurisdictional minimum); *Kovacs v. Chesley*,

---

[10] The vast majority of the 7,633 persons whose information was rented by Mayo during the one-year period preceding the complaint made multiple purchases of its publications since January 1, 2004. Using its subscription lookup tool for *Mayo Clinic Health Letter*, available at https://ssl.drgnetwork.com/ecom/mmv/app/live/subcustserv?org=MMV&publ=HL, a visitor can input the account number along with the ZIP code of a particular record contained in the Castellvi Declaration's Exhibit A. Searches performed by Plaintiffs' counsel of a handful of the records on the first page of this declaration reflect that nearly all of the subscriptions purchased were of a 12-month duration, and thus required recurring purchases each year to renew, and also reveal that many persons made purchases of subscriptions for themselves, as well as separate purchases of subscriptions as gifts for others. *See* **Composite Ex. A** hereto (four redacted pages yielded by searches of Mayo's publicly available subscription database search tool for the accounts identified in rows 4, 5, 8, and 17 of Exhibit A to the Castellvi Declaration., each reflecting 12-month subscription purchases, with two (pp.1-2) reflecting instances of a person making purchases for both himself or herself as well as for another person as a gift). Also, many of the customers whose records appear in Exhibit A, all of whom Castellvi states had their information sold between March 12, 2023 and March 12, 2024, most recently purchased a subscription *after* March 12, 2024 – confirming that many of these persons made multiple purchases from Mayo to renew their subscriptions since January 1, 2004. *See*, e.g., Comp. Ex. A at 3-4 (subscription information pages yielded by searches on Mayo's publicly accessible tool for the records reflected in rows 8 and 17 of Exhibit A to Castellvi Declaration, showing last purchase dates of April 29, 2024 and August 6, 2024, respectively).

406 F.3d 393, 397 (6th Cir. 2005) ("Absolute certainty is not required. It is sufficient if there is a probability that the value of the matter in controversy exceeds the jurisdictional amount."). Even assuming a one-year limitation period and an average of just 1.4 purchases by this group of 7,633 people over the course of the roughly 20-year period since January 1, 2004, there is an aggregate sum of statutory damages at stake in this case in excess of $5 million (1.4 times 7,633 is 10,686.2, and 10,686.2 times $500 is $5,343,100).[11] Thus, it is a clear impossibility, not a "legal certainty," that the amount in controversy in this case is *less* than $5 million in the aggregate. *See Interstate Med. Licensure*, 2024 WL 3998288, at *5. The Motion should be denied on this basis alone.[12]

Moreover, though the Court need not reach this issue to deny the Motion, the limitation period applicable to a NISNPIA claim is three years, not one as Defendant argues. In resolving Mayo's jurisdictional challenge based on CAFA's amount-in-controversy requirement, the Court should assume without deciding that the limitation period is three years, because its contention

---

[11] Additionally, Defendant fails to submit any evidence reflecting the number of occasions on which it rented or sold each of its Utah-based customers' nonpublic personal information to a third party. Even just two such disclosures of each person's nonpublic personal information during the statutory period would double the amount of statutory damages to which each person is entitled under the statute. Notably, the Complaint alleges, and Defendant submits no evidence to refute, that Defendant rented and sold all of its customers' nonpublic personal information to *numerous third parties* during the applicable limitation period. *See* FAC ¶¶ 5, 49-52, 67-70.

[12] Even in the unlikely event the Court finds that the evidence submitted by Mayo is adequate to establish that CAFA's amount-in-controversy requirement cannot be satisfied, the Court should follow the Tenth Circuit's guidance and defer ruling until after Plaintiff has had a reasonable opportunity to conduct discovery on this issue (including examine the materials relied upon in the declarations submitted by Defendant), especially given that all of the relevant information and evidence is in Mayo's (or its agents') exclusive possession. *See Sizova v. Nat'l Inst. of Standards & Tech.*, 282 F.3d 1320, 1326 (10th Cir. 2002); *see also McPhail*, 529 F.3d at 954 (instructing that a party may request a district court to defer ruling on a motion to remand for lack of jurisdiction until limited discovery has been completed); *e.g.*, (all unpublished): *Potts v. Westside Chrysler Jeep Dodge, LLC*, 2021 WL 4129626, at *2 (W.D. Okla. Sept. 9, 2021) (permitting jurisdictional discovery to resolve amount in controversy challenge to jurisdiction); *Cowan v. Devon Energy Corp.*, 2017 WL 5188059, at *1 (E.D. Okla. Nov. 8, 2017) (same) *Cooper-Clark Found. v. Merit Energy Co., LLC*, 2023 WL 7129872, at *2 (D. Kan. Oct. 30, 2023) (same); *DMD Enterprises, Inc. v. Cent. States Trucking Co.*, 2020 WL 4451057, at *2 (W.D. Okla. July 31, 2020) (same).

that claims that accrued beyond the one-year period preceding the commencement of the case are time barred is an affirmative defense to liability that has no bearing on the jurisdictional inquiry before the Court at the motion to dismiss stage of litigation. *See, e.g.*, *Black v. Crowe, Paradis, & Albren, LLC*, 2014 WL 3965043, at \*2 (E.D. Ky. Aug. 13, 2014) (unpublished) (citing *Kovacs*, 406 F.3d at 396) (finding amount in controversy requirement of CAFA adequately established, explaining that "[t]he central problem with [Defendant]'s position is that it impermissibly relies on an affirmative defense that constricts the class size beyond what is alleged in the complaint," and that such attempts "to reduce the size of the alleged class falls outside the scope of the Court's jurisdictional inquiry" because "[w]hereas a court considering a summary judgment motion could examine defenses," "a court considering a dismissal for failure to meet the amount in controversy requirement cannot"); *see also Galaria v. Nationwide Mut. Ins. Co.*, 663 F. App'x 384, 391 (6th Cir. 2016) (unpublished) ("The question whether Plaintiffs have a cause of action is a merits issue that is analytically distinct from the question whether a federal court has subject-matter jurisdiction.").

But even if the Court reaches the statute of limitation question on the merits, it should have little trouble concluding that NISNPIA claims are governed by the three-year limitation period found in Utah Code § 78B-305(4). Section § 78B-305(4) governs because a claim for violation of NISNPIA is a statutory cause of action and the statute itself does not provide a specific limitation period.[13] Relegating this issue to a footnote, Defendant says that NISNPIA claims are governed by

---

[13] "An action may be brought within three years . . . (4) for a liability created by the statutes of this state, other than for a penalty or forfeiture under the laws of this state, except where in special cases a different limitation is prescribed by the statutes of this state[.]". Utah Code § 78B-305(4).

the one-year statute of limitations found in Utah Code § 78B-2-302(2)[14] on the ground that the damages provided by the statute constitute a "state-imposed punitive measure" and thus a "penalty." (Mot. at n.10). But Defendant's only support for a one-year statute is a citation to *In re Castletons, Inc.*, 990 F.2d 551, 557-58 (10th. Cir. 1998), concerning Utah's Late Check Return Statute ("ULCRS"), Utah Code § 70A-4-302(a), which penalizes banks that dishonor a check but fail to return the check before midnight of the same banking day. *Id.* at 58. As another court of this District recognized, *Castletons* is unhelpful outside of the specific statutory context of the ULCRS. *See Roberts v. C.R. England, Inc.*, 318 F.R.D. 457, 502 (D. Utah 2017) (Shelby, C.J.). *Roberts* involved the Utah Business Opportunity Disclosure Act ("UBODA"), Utah Code § 13-15-4, which, like the NISNPIA, is a notice statute.  It requires the sellers of certain business opportunities to make disclosures to presale potential customers. 318 F.R.D. at 494-95. And like the NISNPIA, the UBODA contains a private right of action and establishes minimum statutory damages.  In the case of the UBODA, its amount is set at $2,000. Utah Code § 13-15-6. But, unlike the NISNPIA, the UBODA expressly provides for "fines" and "civil penalties" to be obtained in actions brought by regulators, Utah Code. Ann. § 13-15-301, tracking closer to a penalty statute with a one-year limitations period. Yet, the court in *Roberts* nevertheless found that a one-year statute of limitations does not apply to UBODA claims stating: "Here, the statute imposing liability serves both a compensatory and punitive purpose. For example, an award of the statutory minimum may compensate an individual for actual damages less than $2,000, but would also penalize the seller for the difference between the statutory minimum and the actual damages. *Roberts*, 318 F.R.D. at 502.

---

[14] (2) "An action may be brought within one year . . . (2) upon a statute for a penalty or forfeiture where the action is given to an individual, or to an individual and the state, except when the statute imposing it prescribes a different limitation[.]" Utah Code § 78B-2-302(2).

*Roberts* noted that legislature's characterization of the statutory award as a "penalty" would be significant in determining whether the award provision was a "state imposed punitive measure" under Section 78B-2-302(2) stating: "the Utah Legislature … would have included language, as it did elsewhere in the statute, referring to or characterizing the statutory award as a penalty. It did not." *Id.* at 502-03. *Roberts* is directly applicable here because the $500 amount referenced in the NISNPIA does not refer to that statutory damage amount as a "penalty" at all. Indeed, nowhere in the statute does the word penalty appear. *See, e.g.*, *Curry*, 2023 WL 6318108, at *7 (internal quotation omitted) (discussing NISNPIA's Section 203(2)'s $500 damage award as a "remedy" and stating: "Section 203(2), in turn, creates the applicable remedy by defining what 'a court can do for a litigant who has been wronged[.]'". NISNPIA's overall purpose is, like the UBODA, to provide informed consent to the consumer, and compensating consumers whose information was sold to third parties without having provided such consent. *See* Transcript of Proceedings, Utah House of Representatives, Feb. 6, 2003 (a copy of which is attached as **Exhibit B** hereto, at 9:14-21.) (Rep. Douglas C. Aagard, NISNPIA's co-sponsor, explaining the statute's intent is to confer "a right to privacy that an individual deserves" with respect to their nonpublic personal information collected by companies as a result of consumer transactions and that the statute's effect is that "the consumer will be informed and the consumer will have the choice"); *id*. at 14:22-25. Because claims for violations of NISNPIA are designed to redress nonconsensual disclosures of nonpublic personal information to third parties for compensation, they are compensatory rather than punitive and, as such, are governed by Utah Code § 78B-305(4)'s three-year limitation period.[15] It can thus

---

[15] *Cf. Fernwood Place LC v. Layton Partners Holdings LP*, 2023 UT App 43, ¶ 12, 530 P.3d 165, 169 (applying three-year limitation period under § 78B-2-305 for violation of Utah Wrongful Lien statute); *Flowell Elec. Ass'n, Inc. v. Rhodes Pump, LLC*, 2015 UT 87, 361 P.3d 91, 96 (same, under the High Voltage Overhead Lines Act, the "cause of action and associated liability are created wholly by a statute[.]"); *Olsen v. Eagle Mountain City*, 248 P.3d 465, 473 (same, under Utah Code

reasonably be inferred that the number of Utah-based customers whose information Mayo sold or rented to third parties during the three year period prior to the filing of the complaint is approximately triple the 7,633 figure provided in the Castellvi declaration, which would bring the amount in controversy to over $10 million aggregate under any metric (including even if assumed each of these customers made only one purchase since January 1, 2004, which is obviously not the case). It is thus far from a "legal certainty" that the amount in controversy here case is less than $5 million in the aggregate.

The FAC adequately pleads CAFA jurisdiction, and the Motion should be denied.

## III.     Plaintiff has Article III Standing

Defendant asserts that Plaintiff does not have Article III standing because Plaintiff has not "clearly . . . allege[d] facts demonstrating" that she has suffered an injury in fact that is "concrete and particularized." (Mot. at 15). Judge Parrish addressed this very argument in *Curry II*, 2024 WL 3794487, at *3-5, and rejected it.  This Court should follow suit.

**Plaintiff Has Clearly Alleged Tangible and Intangible Harm.** Defendant claims that Plaintiff's injuries cannot satisfy Article III because they "cause[d] no adverse effects," and that Plaintiff must allege "downstream consequences." (Mot. at 16). However, Plaintiff need not allege any additional "downstream" or "consequential" harms she suffered due to Defendant's disclosures; the disclosure-based harm is sufficient for Article III. *See Curry II*, 2024 WL 3794487, at *5 n.8. Nonetheless, Plaintiff alleges that, "as a result" of Defendant's disclosures of nonpublic personal information, she has suffered tangible harm. For example, Plaintiff has alleged that she "received a barrage of unwanted junk mail" (FAC ¶ 1), which causes "waste and inconvenience" and increases her exposure to "fraudulent sweepstakes, charities, and buying clubs."[16] (FAC ¶ 37).

---

section 78B-2-305(4)); *Scholzen v. Scholzen Prod. Co.*, 2020 WL 7630801, at *6 (D. Utah Dec. 22, 2020) (same, for wage claim brought by employee under Utah Payment of Wages Act).

[16] Defendant asserts, without support, that Plaintiff's allegations of receipt of junk mail and its consequences are deficient because they do not include a specific causal connection between the disclosure and these intrusions. (Mot. at 16-17). Defendant ignores the specific words of the FAC: "[a]s a result." (FAC ¶ 1). There is nothing speculative or conclusory about Plaintiff's allegations.

*Curry II* also dispenses with the argument that pled violations of NISNPIA are insufficient intangible harms to confer Article III standing. *Curry II*, 2024 WL 3794487, at *5. The court held that "Mrs. Fields 'widely communicate[d]' their protected information, including to other parties themselves likely to further widely communicate it . . . reflect[ing] the sort of harm at issue in the tort of public disclosure" and "[t]hus, the plaintiffs ha[d] standing to pursue their claims."[17] *Id.* Examining *Spokeo* and *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) in the context of intangible harms, *Curry II* noted how "both history and the judgment of Congress play important roles" in determining whether an intangible harm constitutes an injury in fact, and indicated that "it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.* at *3-5 (quoting *Spokeo*, 578 U.S. at 340-41). The court explained how *TransUnion* "recite[d] a few such traditional harms: 'reputational harms, disclosure of private information, and intrusion upon seclusion'" but also noted how "*TransUnion* . . . was also careful to emphasize that '[i]n looking to whether a plaintiff's asserted harm has a "close relationship" to a harm traditionally recognized as providing a basis for a suit in American courts, [courts] do not require an exact duplicate.'" *Curry II*, 2024 WL 3794487, at *3 (quoting *TransUnion*, 594 U.S. at 425, 433). Rather, "the harms must be similar in kind, not degree." *Id.* (quoting *Shields v. Prof'l Bureau of Collections of Md., Inc.*, 55 F.4th 823, 828 (10th Cir. 2022)).

As here, the defendant in *Curry II* argued that "the harm complained of was the failure to provide a disclosure, making the injury 'informational' by nature." *See id.* at *4; *cf., e.g.*, FAC ¶¶ 1, 37-39, 52, 59, 77, 80 (alleging far more than a so-called informational injury). This is consistent with the plain text of NISNPIA, the operative provision of which frames the prohibited act as disclosure: "a commercial entity may not disclose nonpublic personal information[.]" *Id*. at *4. *Curry II* rejected defendant's argument because the plaintiffs there, as here, alleged that the

---

Moreover, in this context "general factual allegations of injury" are sufficient. *See Kansas Nat. Resource Coalition v. U.S. Dept. of Interior*, 971 F.3d 1222, 1231 (10th Cir. 2020).
[17] Crucially, here, Plaintiff alleges that Defendant's disclosures of Plaintiff's nonpersonal public information was highly offensive to Plaintiff and the average person. *See* FAC ¶¶ 52, 59, 77.

defendant "disclosed, without providing . . . the prior notice required by Utah Code § 13-37-201, Plaintiff[s'] . . . Private Purchase Information" to various third-party data companies. *Id.* The court found that "[b]ecause it centers on the disclosure of information, plaintiffs' alleged harm is best compared to privacy torts such as public disclosure of private information and intrusion upon seclusion, rather than the conceptually distinct doctrine of informational injury." *Id.* The proper focus for Article III standing is the harm caused by Defendant's disclosures of Plaintiff's nonpublic personal information to third parties. Such conduct creates liability under the statute and infringes upon Plaintiff's concrete, NISNPIA-conferred right to keep such information private.

*Curry II* also finds support for Article III standing under NISNPIA in *Transunion*. 2024 WL 3794487, at *4 ("[u]nsurprisingly, courts around the country have determined that the disclosure of nonpublic personal information" described in *Transunion* "can provide the basis for Article III standing"). In *TransUnion*, the Court held that the dissemination of a misleading credit report constituted a concrete injury in fact under Article III. *TransUnion*, 594 U.S. at 432-33, 442. Here, Plaintiff alleges that Defendant sold her private personal information about purchases of consumer goods for profit to numerous third parties without prior notice, let alone consent. (FAC ¶¶ 8-55). *TransUnion* identified these types of disclosures as a "chief example[s] of the sort of harm traditionally recognized as providing a basis for [a suit] in American courts."[18] *Id.* at 425. The Tenth Circuit has followed *TransUnion*, holding that "disclosure of private information" and "intrusion upon seclusion" are examples of "concrete, intangible harms" that American courts have long recognized at common law and continue to manifest Article III standing. *Seale v. Peacock*, 32 F.4th 1011, 1020 (10th Cir. 2022). Plaintiff alleges she suffered these exact harms. ( *See* FAC ¶¶ 52, 59, 77, 80).

**Public Disclosure of Private Information.** Defendant, as the defendant did in *Curry II*, relies on the Tenth Circuit's decision in *Shields*, arguing that disclosure of information to a third

---

[18] Defendant acknowledges the same (Mot. at 18) – Courts assessing Article III standing brought under personal privacy acts have consistently held that disclosures made in violation of such statutes necessarily result in an invasion of privacy that manifests an injury-in-fact sufficient to satisfy Article III. *See, e.g.*, *Pratt v. KSE Sportsman*, 586 F. Supp. 3d 666, 677 (E.D. Mich. 2022).

party cannot constitute an intrusion on privacy. (Mot. at 18). But, as *Curry II* makes clear, *Shields* is inapposite. *Curry II*, 2024 WL 3794487, at *4-5. *Shields* was brought under a debt collections act, with the plaintiff alleging that sharing a debtor's nonpublic information with a third-party mailer violated the act. *Id.* at *5 (noting that *Shields* involved "the disclosure of information to a single mail vendor whose role was limited to generating and sending a form letter").[19]

Defendant argues that Plaintiff's personal information was not publicly disclosed. It ignores that a plaintiff can have Article III standing for a statutory claim even if she could not succeed on the closely-related traditional tort. *Shields*, 55 F.4th at 828. Plaintiff has alleged improper disclosure far beyond the data companies Defendant cites: the FAC alleges that Defendants "rented, sold, exchanged, and/or otherwise disclosed its customer lists containing Plaintiff's Private Purchase Information . . . to third parties, including other consumer-facing companies, direct-mail advertisers" and other solicitors. (FAC ¶ 70). These sweeping disclosures easily satisfy the definition of "*public* disclosure of private facts, which is concerned with highly offensive information being widely known." *Shields*, at 829 (citing Restatement (Second) of Torts § 652D cmt (Am. L. Inst. 1977)). And here, as in *Curry II*, Plaintiff alleges that Defendant offered to sell Plaintiff's nonpublic personal information on the open market to anyone willing to purchase it and that Defendant sold such information numerous times to numerous third parties. As in *Curry II*, Plaintiff "allege[s] that Mrs. Fields markets their information openly, selling it to any buyer who is willing to pay[,]" disclosing "nonpublic personal information" to third parties "likely to further widely communicate it." 2024 WL 3794487, at *5 (citing *Shields*, 55 F.4th at 829).

Defendant's widespread disclosures of Plaintiff's nonpublic personal information to anyone interested in purchasing it (not just disclosure to a single vendor as in *Shields*) are plainly analogous to the common law tort of disclosure of private information and thus readily satisfy Article III's concreteness test. *See Curry II*, 2024 WL 3794487, at *5 ("In deciding just how

---

[19] The plaintiff argued that the disclosure of her debt information to the mailer was akin to the tort of public disclosure, but the court found the disclosure of nonpublic information to a private party middleman did not reflect the sort of harm protected by that tort. *Shields*, 55 F.4th at 829.

'public' a disclosure must be . . . *Shields* . . . w[as] tasked with a simple line-drawing problem, and offered the obvious answer – disclosure of information to a single private party (one who carries no risk or prospect of further disclosure . . .) is not only not public enough, it is not public at all. *Shields* and related cases must be considered in this context, rather than as standing for the broader proposition that disclosure-based injuries cannot provide a basis for standing generally."); *see also Bohnak v. Marsh & McLennan Co.*, 79 F.4th 276, 285-86 (2d Cir. 2023) (disclosure of personal information "to unauthorized third parties," rather than to the public, has the requisite "close relationship" to the tort of public disclosure of private facts, with the court noting that it did not "stretch to reach this conclusion," because "the intangible harm arising from disclosure of one's [personal information] bears a relationship to an injury with a close historical or common-law analogue," even if it is not "an exact duplicate"). Ultimately, formulating the precise degree of publicity under the common-law tort of public disclosure is unnecessary. *See Curry II*, 2024 WL 3794487, at *5 ("The harm alleged by the plaintiffs here is qualitatively different from the private disclosure discussed in *Shields* and related cases and reflects the sort of harm at issue in the tort of public disclosure . . . . While this again invites the question of just how public is public enough to bear a close relationship with harm protected by the comparator tort of public disclosure, the court is satisfied that, wherever that line is, the plaintiffs here have crossed it."); *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 654 (4th Cir. 2019) ("Our inquiry is focused on types of harms protected at common law, not the precise point at which those harms become actionable.").

In enacting NISNPIA, the Utah legislature sought to protect the rights of consumers to keep nonpublic personal information private. NISNPIA created concrete privacy rights to prevent unauthorized and uninformed disclosures of such information and protect against intrusions into a person's personal preferences and purchasing habits. *See* Utah Code § 13-37-201 & § 13-37-102 (prohibiting commercial entities from disclosing any person's "nonpublic personal information" obtained as a result of the person's purchase of consumer goods from the company, unless the person was first noticed as specified in section 13-37-201, before transacting with the company). Many courts have found Article III standing exists to redress unauthorized disclosures of personal

information in violation of other personal privacy acts, confirming the concreteness of the injuries alleged by Plaintiff here. *Perry v. Cable News Network, Inc*., 854 F.3d 1336 (11th Cir. 2017); *In re Nickelodeon Consumer Privacy Litig*., 827 F.3d 262, 274 (3d Cir. 2016); *Yershov v. Gannet Satellite Info. Network, Inc.*, 240 F. Supp. 3d 353, 361 (D. Mass. 2016).

**Intrusion Upon Seclusion.** The harms alleged here are also akin to those covered by the traditional tort of intrusion upon seclusion. "Intrusion upon seclusion occurs when an individual 'intentionally intrudes, physically or otherwise, upon the solicitude or seclusion of another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person.'" *Salazar v. Nat'l Basketball Ass'n*, 685 F. Supp. 3d 232, 241 (S.D.N.Y. 2023) (quoting Restatement (Second) of Torts § 652B (1977)). Notably, an intrusion upon seclusion "does not depend upon any publicity given to the person whose interest is invaded or to his affairs." *Scott v. Hern*, 216 F.3d 897, 917 (10th Cir. 2000). As an example of the injury, the Restatement (Second) highlights that an intrusion into someone's privacy includes opening one's private mail. Restatement (Second) of Torts § 652B, cmt. b. "The intrusion itself makes the defendant subject to liability, even though there is no publication or other use of any kind of the . . . information outlined." *Id.* Defendant argues, though, that Plaintiff's claims lack a historical common law analogue. But she has adequately pled such a claim. *See, e.g.*, FAC ¶¶ 152, 59, 77, 80. As discussed, Plaintiff's allegations of public disclosure are qualitatively different from the "gravamen" of the comparator tort at issue in Defendant's *Shields*, *Hunstein v. Preferred Collection & Mgmt. Servs.*, 48 F.4th 1236 (11th Cir. 2022), and *Nabozny v. Optio Sols. LLC*, 84 F.4th 731 (7th Cir. 2023). *Shields* merely "considered publicity as requisite to the comparator tort of public disclosure, *not* intrusion upon seclusion and, more importantly, the plaintiffs' allegations[,]" as here, also "are easily distinguishable from the facts alleged in *Shields*." *See Curry II*, 2024 WL 3794487, at *4 (emphasis in original). Plaintiff alleges that Defendant markets her private information openly to any buyer who is willing to pay, including data companies and "third parties, including other consumer-facing companies, direct-mail advertisers[,]" and solicitors – in exchange for lists containing the private purchase information of those third-party companies' customers. (FAC ¶¶ 1, 5, 11, 49-52).

Following *TransUnion*, courts have had little difficulty finding common law analogues to the tort of intrusion upon seclusion for purposes of satisfying Article III.[20] *See Salazar*, 685 F. Supp. 3d at 241 ("Plaintiff's claim that Defendant purposefully shared his private viewing information with a third party without Plaintiff's knowledge or consent is akin to" an "intrusion . . . upon [her] private affairs or concerns" that "would be highly offensive to a reasonable person"); *Feldman v. Star Trib. Media Co. LLC*, 659 F.Supp.3d 1056 (D. Minn. 2023) (disclosures of private video viewing history with Facebook found analogous to the tort of intrusion of seclusion).

Finally, Defendant contends that there can be no Article III standing based on allegations of intangible harm without a showing that it would be "highly offensive to a reasonable person." (Mot. at 20). Defendant argues that the NISNPIA is merely concerned with the failure to provide notice prior to the collection of nonpublic personal information that is subsequently disclosed and that it is the lack of notice that must satisfy the "highly offensive" requirement. *Id*. In fact, it is the alleged harm resulting from the failure to provide notice (and an opportunity for a customer to opt out of receiving the newsletter) that matters. *Shields*, *supra*, 55 F.4th at 828-29. Moreover, *Curry II* considered and rejected any such argument requiring the element of offensiveness in a NISNPIA suit, noting that the Tenth Circuit does not require an element-by-element approach to the comparator tort, such as offensiveness here, to establish standing. *Curry II*, 2024 WL 3794487, at *5 n.8 (noting that *Lupia* did not consider every element of the comparator tort of intrusion upon seclusion before confirming standing). Plaintiff adequately states a claim. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." *Kan. Nat. Res. Coal. v. U.S. Dep't of Interior*, 971 F.3d 1222, 1231 (10th Cir. 2020).

Plaintiff adequately alleges that Defendant's improper disclosures "intruded substantially upon [her] solitude and seclusion (including the personal affairs and concerns)" "in a way that was

---

[20] *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1191 (10th Cir. 2021) ("At common law, courts readily recognized a concrete injury arising from the tort of intrusion upon seclusion – a tort protecting against defendants who intrude into the private solitude of another"). While, as discussed in *Curry II*, in *Shields*, the plaintiff failed to allege that her private solitude had been intruded, failing to link the statutory violation to intrusion upon seclusion. *See Curry II*, 2024 WL 3794487, at *4 n.5.

highly offensive to Plaintiff and would be highly offensive to a reasonable person[.]" (FAC ¶ 77). *See, e.g.*, *Salazar*, 685 F. Supp. 3d 241 (finding the same based upon factual allegations similar to those found in the FAC) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)) (finding "general factual allegations of injury resulting from the defendant's conduct may suffice" at the pleading stage). The FAC contains allegations concerning Defendant's disclosure practices from which it may be reasonably inferred that Defendant's disclosures of Plaintiff's nonpublic personal information to third parties for compensation were intrusive of Plaintiff's private affairs or concerns (e.g., "purchasing habits" and "personal preferences"), and that those disclosures would be highly offensive to a reasonable person (e.g., FAC ¶¶ 1, 39, 54). And the determination of whether these disclosures would be considered highly offensive to a reasonable person is plainly an issue of fact suitable for a summary judgment motion, not a motion to dismiss. The Motion's standing challenge should be denied.

## IV.   Plaintiff Has Stated a NISNPIA Claim Because Mayo Is a Commercial Entity

NISNPIA applies to a "commercial entity" that has an office "or other place of business located in [Utah]" and "in the ordinary course of business transacts a consumer transaction in" Utah. Utah Code §§13-37-102(2)(a), 13-37-203(1). Plaintiff has alleged that Defendant "has one or more office(s) or other place(s) of business in Utah … Additionally, [Defendant] has employees who work for [Defendant] from Utah (and thus conduct business on [Defendant's] behalf at places in Utah." (FAC ¶ 14). Plaintiff also alleges that Defendant "does business throughout Utah … and, in the ordinary course of its business, enters into transactions with consumers in Utah." FAC ¶ 15.

The Motion does not dispute that Defendant transacts business in Utah. Rather, Defendant's contention is that it lacks a "footprint" in Utah. (Mot. at 25). However, Defendant identified in its application to Utah's Department of Commerce its agent as "CT Corporation System" and provided an address of 163 South Temple, Suite 2100, Salt Lake City Utah. (**Comp. Ex. C**).[21] The relevant provisions of the Utah Revised Business Corporation Act confirm that the

---

[21] The FAC identifies Defendant's place of business as 15 West South Temple, Ste 600, Salt Lake City (FAC, ¶ 14), which Defendant claims belongs to "Corporation Service Company" (Mot. at

address provided by Defendant on this document is the "registered office" of the Defendant. *See* Utah Code 16-10a-102(30) ("Registered office" means **the office within this state designated by a domestic or foreign corporation** as its registered office in the most recent document on file with the division providing that information[.]"). Because CT Corporation System is a "commercial registered agent" (*see* **Ex. C**), Utah Code § 16-17-203(1) only required "the name of [Defendant's] commercial registered agent," *id.,* § 16-17-203(1)(a) – not "the name and address of the entity's noncommercial registered agent" – on the application. *Id.* § 16-17-203(1)(b)(i). Thus, the Application completed by Defendant with the addressed disclosed in the FAC, identifies the address of **Defendant's** "office in Utah" for purposes of NINSPIA. And it makes no difference that Defendant has appointed an agent to accept service of process on its behalf at its registered office, or even that the office is maintained by that agent. A principal (in this case the Defendant) acts through its agent, and the agent stands in the shoes of the principal in the eyes of the law. An office maintained by Defendant's agent on Defendant's behalf and at Defendant's direction, where Defendant, *inter alia*, receives mail and accepts service of legal documents, clearly constitutes an "office" of (or a "place of business of") Defendant within the meaning of Utah's statutes.

Additionally, the FAC identifies that Defendant has "**one or more office(s) or other place(s)** of business in Utah." Defendant cannot assert that the FAC fails to allege that Defendant has an office or other place of business in Utah based solely on the contention that the one address named is that of its registered agent. The Court is obligated to accept the FAC's allegations as true and construe them in the light most favorable to the plaintiff. *See Jojola v. Chavez*, 55 F.3d 488, 490 (10th Cir. 1995).  Moreover, Plaintiff need not describe "every fact in specific detail[,]" *Hamilton v. Angerhofer*, No. 2:15-CV-344 DB, 2017 WL 935885, at *1 (D. Utah Mar. 8, 2017), but only "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 547 (2007). Whether Defendant had any other office(s) remains an open

---

24), a different registered agent than the one disclosed in its application with the Department of Commerce.  But whether Defendant has changed its registered agent since its initial registration is of no moment.

question, one which ultimately will be answered through discovery.[22] But at this stage of the proceedings, Plaintiff has alleged facts which, consistent with Rule 8, plausibly give rise to Defendant being a NISNPIA-covered "commercial entity". Similarly, the definition of "other place of business" is a question of fact and subject to discovery. Even were it not, it fails to address Plaintiff's allegation that it "has employees who work for Mayo from Utah (and thus conduct business on Mayo's behalf at places in Utah)."[23] (FAC ¶ 14). Taken as true, this allegation meets the statute's requirement that Mayo has an office "or other place of business located in [Utah]."

Defendant also argues that NISNPIA's legislative history "reinforces that the law is limited to Utah-based companies" based on a self-serving extrapolation from a two-line exchange between a legislator and the NISNPIA's sponsor Rep. Aagard discussing a non-final version of the bill wherein Rep. Aagard stated that the NISNPIA applies to companies domiciled in Utah as opposed to "national companies".[24] (Mot. at 23). The argument is meritless. First, a statute's legislative history is only relevant at all if the Court finds initially that the statute is ambiguous on its face. *See Phillips Petroleum Co. v. Lujan*, 4 F.3d 858, 861 (10th Cir. 1993) ("The best evidence of Congressional intent is the text of the statute itself and where the language is unambiguous, our inquiry is complete.") Here, the NISNPIA statute could not be clearer – the "commercial entity" requirement does not have a "domiciled in Utah" component on its face and hence the Court need not look to legislative history.

Second, Mayo's contention is untenable because it seeks to undermine the statute's plain language based on cherry-picked statements concerning the notion of domicile, a concept, which if it factored into the design of the statute at all, was obviously left behind in the legislative process.

---

[22] For example, per Ex. C, Defendant has also registered "Mayo Clinic Store Siebens" in Utah.
[23] Ex. C confirms the FAC's allegation that Defendant has employees who work from Utah.
[24] The referenced discussion concerned a non-final version of the bill. *See* Ex. A at 7:12-20. Aside from the fact that the final version of the statute did not include any requirement that company be domiciled in the Utah to be subject to liability, the discussed effective date was May 5, 2003. This was met with concern that businesses would not have enough time to become compliant. (*Id*). Legislators went back to the drawing board on this issue, among others, as the final version of the bill had an effective date of January 1, 2004. *See* Utah Code § 13-37-202(1).

The plain statutory text must control and the Court is bound to apply the statute as passed, not as it may have been contemplated at some earlier point in time. *See Zilleruelo v. Commodity Transporters, Inc.*, 2022 UT 1, ¶ 34, 506 P.3d 509, 515–16 (citation omitted) ("[S]tatements of individual legislators 'should not be entitled to any weight' when the statements contradict the plain language of a statute."). This Court should decline Mayo's invitation to second-guess the judgement of the Utah legislature by reading an unwritten "Utah-based company" requirement into the NISNPIA.[25]

Further, Defendant's argument as to what Plaintiff's counsel may have argued in another case simply has no bearing here. (Mot. at 25). The issue in *Curry* was whether, as the defendant asserted, NISNPIA's protection was only limited to Utah residents, a notion Judge Parrish rejected as "infirm" under the statute's plain language. *See Curry II*, 2024 WL 3794487, at *6 (D. Utah Aug. 13, 2024). Plaintiff's argument that NISNPIA covers "Utah-based" companies – which was not at issue in *Mrs. Fields* – is not inconsistent with the FAC's allegations or the NISINPIA's definition of commercial entity. *See Hansen v. Harper Excavating, Inc.*, 641 F.3d 1216, 1227 (10th Cir. 2011) (judicial estoppel requires a party take an inconsistent position). The FAC states a claim, and the Motion should be denied.

## CONCLUSION

Based on the above, Defendant's Motion to Dismiss should be denied in its entirety.

Dated: September 19, 2024              Respectfully submitted,

---

[25] Defendant's reliance on the unpublished *Camoras v. Publishers Clearing House*, 2024 WL 2262786 (D. Utah May 17, 2024) (Mot. at 24) is misplaced. *Camoras* is a non-final order of a Magistrate Judge to which Plaintiff's objections are still pending before the district court. *See Camoras*, 4:23-cv-00118-DN-PK (Dkt. 26) (Jun. 1, 2024). The *Camoras* plaintiff's objections assert that the Magistrate exceeded the bounds of 28 U.S.C. §636(b)(1) by issuing dispositive orders instead of issuing a report and recommendation, compounded this error by reaching a case dispositive issue without adversarial briefing, and misapplied Fed. R. Civ. P. 15 and Fed. R. Civ. P. 8 by denying Plaintiff the ability to amend his Complaint. (*See generally*, *id.*). Plaintiff submits that even if *Camoras* is adopted by the district court, it was wrongly decided.

..

**PETERS | SCOFIELD**
*A Professional Corporation*

/s/ David W. Scofield
DAVID W. SCOFIELD

     -and-

**HEDIN LLP**
FRANK S. HEDIN*

* *Pro Hac Vice* Application Forthcoming

*Counsel for Plaintiffs and Putative Class*